**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| IAN PHILLIP JAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-2107 (RBW) |
| | ) | |
| INTERNATIONAL PAINTERS AND | ) | |
| ALLIED TRADES INDUSTRY PENSION | ) | |
| PLAN, and | ) | |
| GARY J. MEYERS, Administrator | ) | |
| International Painters and Allied Trades | ) | |
| Industry Pension Plan, | ) | |
| | ) | |
| Defendants. | ) | |
_____)

## MEMORANDUM OPINION

Plaintiff Ian Phillip James brings this action under the Employee Retirement Income

Security Act of 1974, 29 U.S.C. §§ 1001-1461 (2006) (the "ERISA"), alleging that the

defendants wrongfully denied him pension benefits, did not provide an adequate explanation for

their decision to deny him these benefits, and failed to produce certain pension plan documents.

See Third Amended Compl. ("3d Am. Compl.") ¶¶ 22-46.  Currently before the Court are the

parties' renewed cross-motions for summary judgment.  Upon careful consideration of the

parties' motions and the entire record in this case,[1] the Court concludes for the following reasons

_____

[1] In addition to the third amended complaint, the Court considered the following submissions and their
supporting exhibits in rendering its decision: (1) the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."); (2)
the Defendants' Motion for Summary Judgment ("Defs.' Mot."); (3) the defendants' Memorandum of Points and
Authorities in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Mem."); (4) the Memorandum of
Points and Authorities in Support of Defendants' Renewed Motion for Summary Judgment ("Defs.' Renew.
Mem."); (5) the Plaintiff's Opposition to Defendants' Renewed Motion for Summary Judgment (consolidated with
the plaintiff's renewed motion for summary judgment) ("Pl.'s Renew. Mot."); (6) the Defendants' Memorandum of
Points and Authorities in Reply to Plaintiff's Opposition to Defendants' Renewed Motion for Summary Judgment
(Defs.' Renew. Reply"); (7) the Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's
Motion for Summary Judgment ("Defs.' Renew. Opp'n"); (8) the Plaintiff's Reply to Defendant's Opposition to
Plaintiff's Renewed Motion for Summary Judgment ("Pl.'s Renew. Reply"); (9) the defendants' Supplemental

(continued . . . )

that the defendants' motion must be granted in part and denied in part, and that the plaintiff's motion must be denied.

## I. BACKGROUND

**A.     Facts**

The following facts are not in dispute and are taken in part from a memorandum opinion previously issued in this case.  See James v. Int'l Painters & Allied Trades Indus. Pension Plan, 710 F. Supp. 2d 16, 18-21 (D.D.C. 2010).  The plaintiff was a member of the Glaziers Local Union 963 (the "Union") starting from at least August 1, 1962.  Id. at 18.  During his membership with the Union, the plaintiff worked for various employers who contributed to the Glaziers Local 963 Pension Plan (the "Local 963 Plan" or "Plan").  Id.  The Local 963 Plan was, from its inception, a trust fund administered by a joint labor-management board of trustees as defined under 29 U.S.C. § 186(c)(5).  Id.  Effective January 1, 1998, the Local 963 Plan merged with the International Painters and Allied Trades Industry Pension Plan (the "Merged Plan").  Id. The Merged Plan preserved all benefits that had vested under the Local 963 Plan.  Id.

This case concerns two versions of the Local 963 Plan: one adopted in 1971 and another in 1993.  Both versions of the Local 963 Plan contain the following pertinent components.  To claim a vested interest in a pension, an employee must have accrued ten years of service credit.

---

(. . . continued)
Declaration of Judith Sznyter in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Suppl. Decl."); (10) the Plaintiff's Supplemental Memorandum in Support of Renewed Motion for Summary Judgment ("Pl.'s Suppl. Mem."); (11) the Defendants' Supplemental Memorandum of Points and Authorities in Support of Defendants' Renewed Motion for Summary Judgment ("Defs.' Suppl. Mem."); (12) the Plaintiff's Reply to Defendants' Supplemental Memorandum ("Pl.'s Suppl. Reply"); and (13) the Defendants' Reply to Plaintiff's Supplemental Memorandum in Support of Plaintiff's Renewed Motion for Summary Judgment ("Defs.' Suppl. Reply").

1971 Plan § 3.1; 1993 Plan § 3.1.[2] Employees who incurred "breaks in service" prior to vesting

lost all accrued service credit. See 1971 Plan § 2.3 ("An employee will incur a loss of credited

service when he fails to work at least 160 hours in any one of two (2) consecutive calendar

years."); 1993 Plan § 4.3 ("If an Employee has five consecutive Breaks in Service before he has

earned Vested status, and if the number of consecutive Breaks in Service equals or exceeds his

number of years of Vesting, he has a Permanent Break in Service. A Permanent Break in

Service has the effect of canceling the Employee's participation, his previously credited Vesting

Service, and his previous Benefit Service."). Service credits are divided into either past service

credit, which is credit awarded for employment with a contributing employer prior to October 1,

1965, or future service credit, which is credit awarded for employment with a contributing

employer after October 1, 1965. 1971 Plan §§ 2.1-2.2; 1993 Plan § 4.1.

The plaintiff, believing that he had accumulated "14.54 years of covered employment,"

which would qualify him as "a vested member of the Glaziers Local 963 union," submitted an

application for retirement benefits to the defendants in February 2005. 3d Am. Compl. ¶¶ 5, 7.

The defendants denied the plaintiff's application on March 29, 2005, claiming that the records

provided to the Merged Plan by the Local 963 Plan at the time of the merger did not list the

plaintiff as a vested participant. James, 710 F. Supp. 2d at 19. The plaintiff then

administratively appealed the defendants' denial of benefits. Id. On August 23, 2005, the

defendants denied the plaintiff's administrative appeal for the same reasons stated in their initial

---

[2] The text and accompanying descriptions of the 1971 and 1993 versions of the Local 963 plans were previously submitted to the Court in conjunction with the defendants' first motion for summary judgment. The 1971 Plan is found at ECF No. 16-1 (Declaration of Kent Cprek), Exhibit ("Ex.") 13 (Glaziers Local 963 Pension Fund Plan Description and Text of Plan, Effective April 1, 1971), and the 1993 Plan is found at ECF No. 16-1 (Declaration of Kent Cprek), Ex. 40 (Glaziers Local 963 Pension Fund Plan Summary Plan Description and Text of Plan, As Amended Effective January 1, 1993). For ease of reference, the Court will reference these plans by listing the year of the plan followed by the corresponding section number.

decision, but provided for further review of the plaintiff's application upon receipt of a Social Security Administration ("SSA") earnings report for the plaintiff. Defs.' Mot., Ex. 25 (August 23, 2005 Letter from Gary J. Meyers to Ian P. James) at 1. The defendants thereafter received the plaintiff's SSA earnings report, but were unable to determine from that record whether the plaintiff had any additional work in covered employment under the Local 963 Plan that qualified him as a vested Plan participant. Id., Ex. 32 (March 29, 2007 Letter from Gary Myers to Neil Intrater) at 1.

However, during their review of the plaintiff's claims, the defendants discovered a Local 963 Plan record from 1973 which indicated that the plaintiff had "accumulated 3.3 years of past service credit before October 1, 1965, and 6.2 years of future service credit," for a total of 9.5 service credits. Defs.' Renew. Mem. at 3; see Pl.'s Mot., Ex. 13 (Annual Pension List Fund for Year Ending 12/31/1973 ("1973 Pension Record")). Based on this newly discovered record, the defendants issued a revised determination on June 27, 2007, awarding the plaintiff $409.68 in monthly pension benefits. 3d Am. Compl. ¶ 13. At the plaintiff's request, the defendants subsequently issued the following "breakdown" of their calculation of the $409.68 award:

| Years of Service | Benefit Level | Benefit |
|---|---|---|
| 3.3 years of Past Service Credit | $1.50 | $54.00 |
| 6.2 years of Future Service Credit | $4.94 | $355.68 |
| **Total Monthly Benefit** | | **$409.68** |

Defs.' Mot., Ex. 38 (August 16, 2007 Letter from Gary Meyers to Neil Intrater) at 1.[3]

After receiving the defendants' clarification letter, the plaintiff administratively appealed the defendants' June 27, 2007 $409.68 monthly pension award. Defs.' Mot., Ex. 39 (August 20,

---

[3] As explained infra at pages 6-7, the defendants later acknowledged that the foregoing calculation of the $409.68 award was mathematically incorrect.

2007 Letter from Neil Intrater to the International Painters and Allied Traders ("IPAT") Board of Trustees) at 1.  Specifically, the plaintiff appealed the "amount of the award," claiming that it was improperly "calculated based upon 9.5 credits," rather than the "14.54 credits" to which he claimed entitlement.  Id.  In support of his claim that he was entitled to 14.54 service credits, the plaintiff asserted that the defendants failed to credit him for service in covered employment from 1959 to 1972 and 1979 to 1980.  Defs.' Mot., Ex. 4 (March 3, 2008 Letter from Gary Meyers to Neil Intrater) at 2.

The defendants denied the plaintiff's administrative appeal by letter dated March 3, 2008. Id. at 2-4.  In rejecting the plaintiff's appeal, the defendants again highlighted the 1973 Pension Record that listed the plaintiff as having only 9.5 service credits, noting that the plaintiff failed to produce "any reliable evidence of additional service beyond" what was stated in this record.  Id. at 2.  Regarding the plaintiff's claimed service between 1959 and 1962, the defendants found that while the plaintiff's SSA earnings report "show[ed] work before 1962 with Local 963 employers, it [did] not show that this work was under a Local 963 Collective Bargaining Agreement," and that it was "unlikely that the [plaintiff] worked continuously in the Local 963 bargaining unit in Maryland from 1959 to 1962 without union membership."  Id. at 3.  They deemed the plaintiffs' "belated and self-serving claim . . . about the nature of his work . . . insufficient to overcome the contemporaneous records."  Id.  With respect to the claimed service credits in 1965, the defendants explained that "Section 4.1(a) of the [1993 Plan] gives past service credit for any plan year that began before [October 1, 1965]," where the employee "work[ed] under a Local 963 Collective Bargaining Agreement."  Id. at 2.  Because the term "plan year" was not defined in the 1993 Plan, the defendants inferred from the 1973 Pension Record that the term designated a

"calendar year." Id.  The defendants did not provide a detailed breakdown of how it concluded

that the plaintiff was entitled to 3.3 years of past service credit, but they did state that credits

earned in "early 1965" were "drop[ped]" from the calculation, and the plaintiff instead received

"part[-]year credit" in 1965 for work performed "from October 1, 1965 to December 31, 1965."

Id.  Regarding service credit for 1966 to 1969, the defendants estimated the credit to which the

plaintiff was entitled "by [computing] the ratio of earnings for years 1967, 1968, and 1969 from

contributing employers to the high earnings from contributing employers on the [plaintiff's

Social Security] report in 1966." Id. at 3.  The defendants claimed that this calculation, when

considered along with the 1973 Pension Record, confirmed that the plaintiff was only entitled to

6.2 future service credits for the time period between 1966 and 1973. Id.  As for the disputed

service credits in 1979 and 1980, the defendants found "no record of contributory work in this

period beyond union membership from December 5, 1979 to April 2, 1980." Id.

   While the plaintiff continued to dispute the defendants' attribution to him of only 9.5

years of service, he ultimately decided that "due to the lack of documentation from the

[d]efendants," as well as "concern[s] about retaliation," he would "discontinue the litigation." 3d

Am. Compl. ¶ 16.  Accordingly, on June 7, 2008, the plaintiff "executed . . . acceptance forms

for the $409.68 pension." Id. ¶ 17.  However, by a letter dated June 19, 2008, the defendants

informed the plaintiff that they were rejecting his acceptance forms and retracting the $409.68

monthly pension award, based on their determination that he was not entitled to that award.  Pl.'s

Mot., Ex. 8 (June 19, 2008 Letter from Gary Meyers to Ian James) at 1.  The letter explained that

the defendants did not alter the past or future service credits previously awarded to the plaintiff,

but that they did make two modifications: first, the defendants revised the amount that the

plaintiff should receive for past service credit from $1.50 to $4.94; and second, they addressed a mathematical error contained in their August 16, 2007 clarification letter by adjusting the total benefit based on a correct computation of the plaintiff's service credit totals multiplied by the monthly award rates.  Id. at 1-2.[4]

## B.    Procedural Background

The plaintiff instituted this action on November 20, 2007, and subsequently amended his original complaint twice.  His third amended complaint, filed July 21, 2008, contains the following seven counts: Count 1 "seeks compensatory damages for the past benefits that have been improperly denied" to the plaintiff, 3d Am. Compl. ¶23; Count 2 "seeks a declaratory judgment as to the amount of benefits, both past and future, to which [the plaintiff] is entitled," and alternatively requests a "declaratory judgment that [the plaintiff] is entitled to the $409.68 in monthly benefits previously awarded by the [d]efendants," id. ¶¶ 25-26; Count 3 asserts that the defendants unlawfully retaliated against the plaintiff and one of the plaintiff's coworkers in violation of 29 U.S.C. § 1140, id. ¶¶ 27-34; Count 4 "seeks injunctive relief directing [the defendants] to pay the [p]laintiff the benefits to which [he] is entitled," and to "discontinue their retaliatory actions," id. ¶¶ 36-37; Count 5 asserts that the defendants unlawfully failed to provide the plaintiff with "union employment records or relevant documentation and failed to provide [the p]laintiff with an understandable explanation for the denial of benefits" in violation of 29 U.S.C. § 1132(c)(1)(B) and 29 U.S.C. § 1133, id. ¶ 39; Count 6 asserts a claim for "common law

---

[4] Specifically, as indicated in the chart supra at page 4, the defendants' clarification letter stated that the plaintiff was entitled to $54.00 per month based on his 3.3 years of past service credit calculated at a rate of $1.50 per year, and $355.68 per month based on his 6.2 years of future service credit calculated at a rate of $4.94 per year, for a total of $409.68 in monthly benefits.  Defs.' Mot., Ex. 38 (August 16, 2007 Letter from Gary Meyers to Neil Intrater) at 1. Simple arithmetic makes clear, however, that multiplying 3.3 years of past service credit at a rate of $1.50 yields a benefit of $4.95 per month, and that multiplying 6.2 years of future service credit at a rate of $4.94 per month yields a benefit of $30.63, which would result in a total monthly benefit of only $35.58, not $409.68.

breach of contract" against the defendants, id. ¶ 44; and Count 7 requests attorneys' fees and costs, id. ¶ 46.

By memorandum opinion dated April 30, 2010, this Court granted summary judgment to the defendants as to the plaintiff's claims for retaliation, breach of contract, and access to certain employment and union records.  James, 710 F. Supp. 2d at 29-32.  As to the plaintiff's claims for denial of benefits and access to Plan documents, the Court denied the parties' motions for summary judgment without prejudice, and remanded this case to the defendants for a determination of whether the plaintiff's benefit application fell under the 1971 or 1993 version of the Local 963 Plan.[5]  See id. at 26-29.  In the event the defendants concluded that the 1971 Plan applied, the Court ordered them to make a "full and fair assessment of [the plaintiff's] claims" using the standards set forth in the 1971 Plan for determining whether the plaintiff has a vested pension under the Local 963 Plan, and provide a "clear communication to the claimant of the specific reasons for benefit denials, if any, under the terms of that version of the plan."  Id. at 27 (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003)) (internal quotation marks omitted).

Following the Court's remand, the defendants determined that the 1971 Plan controlled, but that, even under this version of the plan, there was no basis for altering their previous findings.  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 2.  The defendants also endeavored to offer a "more coherent explanation" for their determination that the plaintiff was entitled to only 3.3 years of past

---

[5] The defendants later explained that they did not consider the provisions of the 1971 Plan in their initial decision because they did not possess a copy of the Plan document until the plaintiff produced it during discovery. Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 2.

service credit.  Id.  They reiterated their view that the 1973 Pension Record, which accorded the plaintiff 3.3 years of past service credit and 6.2 years of future service credit, was the "best available remaining record of service," and added that this record's indication that the plaintiff fell short of the 10 years of service required for vesting explained why the plaintiff was not listed as a vested employee in the Union's Plan records at the time of the Union's merger with the IPAT.  Id.  As justification for their reliance on the 1973 Pension Record, the defendants noted that their general practice is "to rely on plan records, particularly if they are consistent with other records, as the best basis for uniform treatment of all employees."  Id. at 3.  The defendants further stated that the Local 969 Plan documents, as well as the plaintiff's union membership records showing a Union "initiation date" of August 1962, supported an award of 3.3 past service credits to the plaintiff for covered employment from August 1, 1962, to October 31, 1965.  Id.  While acknowledging that the plaintiff's SSA earnings report showed work prior to August 1962 with "glass industry employers," the defendants adhered to their view that this work was not "covered by the collective bargaining agreement" and thus did not count toward the plaintiff's credited service.  Id.  The defendants additionally noted that the plaintiff, after earning only 9.5 service credits (0.5 credits short of the number needed for vesting) for covered employment from 1962 to 1972, had an "acknowledged break in contributory work from 1973 to 1979."  Id.  Because the terms of the 1971 Plan provided that employees with less than 10 years of service credit lost all credit on a break of 2 calendar years with less than 160 hours of credit, the defendants concluded that the plaintiff's admitted break in service cancelled all of his service credit for 1962 to 1972.  Id.

The parties thereafter renewed their cross-motions for summary judgment.  By order dated September 19, 2011, the Court again denied the parties' cross-motions for summary judgment without prejudice and once again remanded this case back to the defendants. September 19, 2011 Order at 8, James v. Int'l Painters & Allied Trades Indus. Pension Plan, No. 07-2107 (D.D.C.) ("September 19, 2011 Order").  While agreeing "with the defendants' explanation that the 1971 Plan governs this case," id. at 2 n.1, the Court found the defendants' interpretation of the Plan unreasonable, id. at 7.  Namely, the Court found fault with the defendants' determination that the plaintiff was entitled to 3.3 years of past service credits, as the 1971 Plan plainly does "not contemplate the use of partial years of credited service because it only speaks of awarding credits in one year increments."  Id. at 6.  The Court concluded that this interpretation of the 1971 Plan, even under a deferential standard of review, could not stand.  Id. Because the "amount of the plaintiff's credited service will have ramifications for his remaining claims," the Court deemed it imprudent to further analyze the parties' arguments, and thus remanded this case to the defendants "to afford them another opportunity to calculate the plaintiff's past service credits in a manner that is reasonably supported by the language . . . of the 1971 Plan."  Id. at 7-8.

In accordance with the Court's order, the defendants sent the plaintiff a letter that served as a "written calculation and explanation to the plaintiff . . . of the amount of past service credits [to which] he is entitled."  Pl.'s Suppl. Mem., Ex. 53 (October 13, 2011 Letter from Kent Cprek to Neil Intrater) at 1.  The defendants determined that the plaintiff is entitled to only 3 years of past service credits, id. at 4, based on the following factors.  First, the 1971 Plan language provides that covered employees receive a "full year's credit for every year worked under a

bargaining agreement of the union," which, in the defendants' view, is "most consistent with credit only for completed full years before October 1, 1965." Id. (emphasis added).  Second, a 1972 amendment to the Plan provided past service credit for "service performed for each Plan Year that begins before October 1, 1965, any part of which the employee was covered by a collective bargaining agreement of the Union"; according to the defendants, this modified language "suggests a change in the meaning of the Plan." Id. (emphasis added).  Third, the defendants stated that the "Plan records indicate both the change in the [P]lan and that the change was not retroactive, so that the amendment did not affect James nor restore his previously cancelled service to allow him to vest." Id.  Finally, the defendants found that the "Merger Agreement with the Local 963 Plan expressly indicates" that the Merged Plan trustees must rely "on the accuracy of information provided by the Local 963 Plan trustees," and that, "[i]f [such] information was inaccurate, the [Merged] Plan [trustees were] allowed to reduce future benefit accruals for Local 963 Plan employees to account for the increased costs." Id.  They added that the Merged Plan trustees are "not now in a position to find and correct past service records for those who left before the merger or estimate the associated costs." Id.

Following issuance of this letter, and at the parties' request, the Court reinstated the parties' previously denied cross-motions for summary judgment, and directed supplemental briefing based on the defendants' October 13, 2011 determination.  In their supplemental memorandum, the defendants reiterate their contentions that (1) the 1971 Plan, rather than the 1993 Plan, applies in this case; (2) even if the 1993 Plan controls, the plaintiff is barred from pursuing any claims based on the 1993 summary plan description; and (3) under the 1971 Plan, the plaintiff is entitled to only 3 years of past service credit.  Defs.' Suppl. Mem. at 2-3.  The

plaintiff responds, asserting that (1) the 1993 Plan is the controlling version of the Plan, Pl.'s

Suppl. Reply at 1; (2) the terms of the 1993 Plan establish that he is entitled to a higher benefit

multiplier than what is being offered by the defendants, id. at 3-4; and (3) his testimony and

Social Security records demonstrate that he worked in covered employment between 1959

through 1965, and he therefore should be granted at least 6 years of past service credit, id. at 4-5.

The plaintiff adds that "the [d]efendants have continued to ignore the uncontradicted evidence of

over 14 years of credits" for covered employment from 1959 through 1972, 1979, and 1980,

"and have continued to refuse to award [him] his rightful pension."  Pl.'s Suppl. Mem. at 2.

## II.  STANDARD OF REVIEW

This Court previously found that a deferential standard of review applies to the plaintiff's

wrongful denial of benefits claim under the ERISA, see James, 710 F. Supp. 2d 23-24, and it

discerns no reason to depart from that determination, see September 19, 2011 Order at 6

("Despite the attempts by the plaintiff to revive his argument that a de novo standard of review

should be applied, . . . the Court remains unconvinced that this is the appropriate approach to

employ.").  This standard of review has been "variously described by the [Supreme] Court as

'arbitrary and capricious' or 'abuse of discretion,'" but, regardless of how it is phrased, the

standard "is plainly deferential."  Wagener v. SBC Pension Benefit Plan-Non-Bargained

Program, 407 F.3d 395, 402 (D.C. Cir. 2005) (citing Firestone Tire & Rubber Co. v. Bruch, 489

U.S. 101, 111-115 (1989)).  The District of Columbia Circuit "has defined the Firestone

deferential standard as one of 'reasonableness.'"  Id. (quoting Block v. Pitney Bowes, Inc., 952

F.2d 1450, 1454 (D.C. Cir. 1992)).  Thus, in applying this standard, the "essential inquiry" for

this Court is whether the defendants "reasonably construe[d] and appl[ied]" the Local 963 Plan

in this case.  Block, 952 F.2d at 1454.  "If there is more than one action that is 'reasonable,' the

Court must not overturn a decision found to be reasonable, even if an alternative decision also

could have been considered reasonable."  Id. at 1452 (internal quotations omitted).

    As noted, this matter is currently before the Court on the parties' renewed cross-motions

for summary judgment.  Ordinarily, summary judgment is appropriate where "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  But in an ERISA case, "[w]hen the decision to grant or deny benefits is reviewed

for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal

question before the district court and the usual tests of summary judgment, such as whether a

genuine dispute of material fact exists, do not apply."  Bendixen v. Standard Ins. Co., 185 F.3d

939, 942 (9th Cir.1999), overruled on other grounds in Abatie v. Alta Health & Life Ins. Co., 458

F.3d 955, 966-69 (9th Cir. 2006) (en banc); accord Orndorf v. Paul Revere Life Ins. Co., 404

F.3d 510, 517 (1st Cir. 2005) ("[I]n an ERISA case where review is based only on the

administrative record before the plan administrator and is an ultimate conclusion as to disability

to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue.").

Thus, insofar as the parties' summary judgment motions concern the defendants' denial of

benefits to the plaintiff, the motions are merely procedural vehicles for the Court's determination

of whether the defendants' actions were reasonable.[6]

---

[6] The arguments made by the plaintiff in support of his renewed summary judgment motion reveal his
misunderstanding of the scope and nature of the Court's review of his wrongful denial of benefits claim.  In
particular, he contends that he is entitled to summary judgment because he has submitted affidavits, deposition
testimony, and other filings that have gone un-rebutted by the defendants, and that "[t]he rules of summary judgment
therefore mandate that [the plaintiff's] evidence be accepted as the undisputed facts."  Pl.'s Renew. Reply at 1; see
also Pl.'s Suppl. Mem. at 4-5.  As just explained above, this is not the correct standard to apply when reviewing an
ERISA denial of benefits claim under a deferential standard of review.

# III.  ANALYSIS

The Court must first evaluate the defendants' determination that the 1971 version of the Local 963 Plan governs this case.  Next, the Court will address the plaintiff's wrongful denial of benefits claim under the ERISA, looking at both the reasonableness of the defendants' interpretation of the applicable Local 963 Plan as well as the adequacy of the explanation for their denial of benefits to the plaintiff.  Finally, the Court will consider the plaintiff's claim based on the defendants' alleged failure to produce Plan documents.

## A.     The Controlling Version of the Local 963 Plan

As explained above, the Court previously remanded this case to the defendants for a determination of which version of the Local 963 Plan applied to the plaintiff's claim for benefits, after which the defendants issued a letter on July 9, 2010, concluding that the 1971 Plan controlled.  The Court then issued its September 19, 2011 Order, in which it stated in a footnote that it "agree[d] with the defendants' explanation that the 1971 Plan governs this case." September 19, 2011 Order at 2 n.1.  The plaintiff resists this conclusion in his supplemental memorandum, reiterating his position that the 1993 Plan governs.  Pl.'s Suppl. Reply at 1-3. Because the Court did not previously provide a detailed explanation of why it accepted the defendants' view that the 1971 Plan applies, it will do so now.

Section 11.4 of the 1993 Plan provides as follows:

> The terms and conditions of the Plan as restated herein shall amend and supersede, effective October 1, 1976, the terms and conditions of the Glaziers Local 963 Pension Plan, as in effect prior to October 1, 1976; provided, however, that the provisions of such prior plan shall continue to govern the rights of all Employees who were covered thereunder and who do not become Active Employees on or after October 1, 1976, except as otherwise stated herein.

1993 Plan § 11.4 (emphasis added).  As for who constitutes an "Active Employee" under the

1993 Plan, Section 1.2 states:

> "Active Employee" means, as of the date in question, an Employee or former
> Employee who is other than a Retired Employee, and who has not incurred a one-
> year Break in Service, <u>or if he has incurred a one-year Break in Service, has had</u>
> <u>contributions made to the Plan on his behalf subsequent to his most recent one-</u>
> <u>year Break in Service,</u>[7] provided however, that an employee who has not had
> contributions made to the Plan on his behalf on or before October 1, 1976, shall
> not be considered to be an Active Employee.

1993 Plan § 1.2 (emphasis added).  Incorporated within the definition of the term "Active

Employee" is the term "Employee," which the 1993 Plan defines as "any person who is covered

by a collective bargaining agreement between his Employer and the Union . . . and for whom the

Employer is required to contribute to this Plan pursuant to the collective bargaining agreement."

1993 Plan § 1.11.

According to the defendants, Section 11.4 of the 1993 Plan "preserves the [1971 P]lan for

any Participants in the Plan before October 1, 1976[,] who did not have contributions paid to the

Local 963 [Plan] for their work after October 1, 1976."  Defs.' Renew. Mem., Ex. 45 (July 9,

2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 2.  Because

the plaintiff was covered under the 1971 Plan, and because the defendants found "no evidence of

any contributions to the Local 963 Plan for work by [the plaintiff] after October 1, 1976," the

defendants concluded that the 1971 Plan, not the 1993 Plan, applied to the plaintiff.  <u>Id.</u>

In challenging the defendants' determination that the 1971 Plan controls, the plaintiff first

contends that any attempt to distinguish between the 1971 and 1993 Plans is misguided because

they are not separate plans, but amended descriptions of the same plan.  <u>See</u> Pl.'s Renew. Mot. at

---

[7] As discussed in greater detail <u>infra</u> at page 20 of this memorandum opinion, the plaintiff admittedly incurred a
five-year break in service from 1973 to 1978.

5-7; Pl.'s Suppl. Reply at 2.  This argument misses the mark.  While it is true that the 1971 and

1993 Plans are merely different versions of the same pension plan, it is equally clear that the

1993 Plan precludes the applicability of the 1993 Plan amendments to "[e]mployees who were

covered [by the 1971 Plan] and who do not become Active Employees on or after October 1,

1976."  1993 Plan § 11.4.  Thus, based on the 1993 Plan's plain language, the defendants

reasonably concluded that the 1993 Plan "preserves the [1971 P]lan for any Participants in the

Plan before October 1, 1976[,] who did not have contributions paid to the Local 963 [Plan] for

their work after October 1, 1976."  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary

J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 2.

       The plaintiff also raises a more substantial objection to the defendants' conclusion that

the 1971 Plan controls—namely, that he was an "Active Employee" after October 1, 1976,

thereby making the 1993 amendments applicable to him pursuant to Section 11.4 of the 1993

Plan.  Pl.'s Renew. Mot. at 7-9; see 1993 Plan § 11.4 (providing that the 1993 Plan shall apply to

employees who were covered by the 1971 Plan and who "bec[a]me Active Employees on or after

October 1, 1976").  According to the plaintiff, the undisputed evidence shows that he worked in

1979 and 1980 for Beltway Glass Company ("Beltway"), a union employer who made

contributions to the Local 963 Plan on his behalf.  Pl.'s Renew. Mot. at 8-9.  And the plaintiff

contends that such contributions made him an "Active Employee" after October 1, 1965, see

1993 Plan § 1.2, thus triggering the applicability of the 1993 Plan, see 1993 Plan § 11.4.

       The defendants acknowledge that Beltway had collective bargaining agreements with the

Union in 1979 and 1980, and they do not dispute that Beltway made contributions to the Local

963 Plan on behalf of its employees in 1979 and 1980.  See Defs.' Suppl. Decl. ¶ 5.  However,

the defendants point out that the plaintiff was "an owner of Beltway Glass Company." Id. The

plaintiff's status as an owner, the defendants assert, establishes "that he was not covered by the

collective bargaining agreement" between Beltway and the Union in 1979 and 1980. Id. The

defendants thus adhere to their conclusion that the plaintiff has no proof of work after October 1,

1976, with an employer who made contributions to the Local 963 Plan on his behalf, and that the

1971 Plan consequently controls. Defs.' Renew. Opp'n at 6-9; Defs.' Suppl. Reply at 4-6.

The Court finds that the defendants' conclusion rests on a reasonable interpretation of the

Local 963 Plan and the record in this case. For the 1993 Plan to apply to the plaintiff, he had to

be an "Active Employee" on or after October 1, 1976 (i.e., his employer had to make

contributions to the Local 963 Plan on his behalf on or after October 1, 1976). See 1993 Plan §§

11.4, 1.2. The only union employment claimed by the plaintiff after October 1, 1976, is with

Beltway in 1979 and 1980. See Pl.'s Reply, Ex. 41 (Supplemental Affidavit of Ian James) at 1-2

(detailing the plaintiff's employment from 1959 to 1980). To be sure, the record reveals that

Beltway had a collective bargaining agreement with the Union in 1979 and 1980, see Defs.'

Suppl. Decl., Ex. 1 (Agreement Between Beltway and the Union, effective October 1, 1978 to

September 30, 1981), and that Beltway made contributions to the Local 963 Plan in 1979 and

1980, see Pl.'s Renew. Reply, Ex. 52 (Cash Receipts and Hours spreadsheet) at 4-6 (reflecting

pension payments from Beltway to the Union in 1979 and 1980). But, as the defendants point

out, the plaintiff admittedly was not an employee of Beltway—he was one of its owners. See,

e.g., Deposition of Ian Philip James [ECF No. 17-1] at 128:5-29:2 (acknowledging that the

plaintiff was "an owner of a partnership called Beltway Glass"); Defs.' Suppl. Decl., Ex. 1

(Agreement Between Beltway and the Union, effective October 1, 1978 to September 30, 1981) at 24 (signed by Ian Philip James on behalf of Beltway).

Based on the plaintiff's status as an owner of Beltway in 1979 and 1980, the defendants reasonably determined that he was not an "Active Employee" of Beltway during these years. The defendants' conclusion is supported by the 1993 Plan language in two respects.  First, the plaintiff was not an "Employee" within the meaning of the 1993 Plan, which is a necessary component of qualifying as an "Active Employee."  The 1993 Plan defines "Employee" as "any person who is covered by a collective bargaining agreement between his Employer and the Union . . . and for whom the Employer is required to contribute to this Plan pursuant to the collective bargaining agreement."  1993 Plan § 1.11.  And the collective bargaining agreement between Beltway and the Union prohibited "owners" and "employers having a proprietary interest in the business" from performing any work under the agreement, Defs.' Suppl. Decl., Ex. 1 (Agreement Between Beltway and the Union, effective October 1, 1978 to September 30, 1981) at 6, thus indicating that owners, such as the plaintiff, were not covered by that agreement. In view of their finding that the plaintiff was not covered by the collective bargaining agreement between Beltway and the Union, it was reasonable for the defendants to conclude that the plaintiff was not an "Employee" in 1979 and 1980, and that he consequently was not an "Active Employee" during those years.  See Defs.' Suppl. Reply at 6.  Second, because the plaintiff was not covered by the collective bargaining agreement, Beltway's contributions to the Local 963 Plan in 1979 and 1980 for bargaining unit work were not "contributions made to the Plan on [the plaintiff's] behalf," 1993 Plan § 1.2 (emphasis added), a prerequisite for the plaintiff to qualify as an "Active Employee."

Accordingly, the defendants reasonably determined that (1) the evidence of Beltway's contributions to the Local 963 Plan in 1979 and 1980 did not prove that the plaintiff was an "Active Employee" after October 1, 1976, and (2) in light of the absence of evidence showing contributory work by the plaintiff after October 1, 1976, the 1971 Plan governs this case.[8] Summary judgment as to the applicability of the 1971 Plan is therefore granted to the defendants.

**B.      The Plaintiff's Claim for Wrongful Denial of Benefits**

Under the ERISA, a participant in a covered plan may sue "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Counts 1 and 2 of the third amended complaint seek such benefits and declaratory relief under this provision of the ERISA. See 3d Am. Compl. ¶¶ 22-26. In assessing the plaintiff's claim for wrongful denial of benefits, it is first necessary to understand several pertinent provisions of the 1971 Plan.

To claim a vested interest in a pension under the 1971 Plan, an employee must have accrued at least 10 years of service credit. 1971 Plan § 3.1. Service credits are divided into either past service credit, which is credit awarded for employment with a contributing employer prior to October 1, 1965, or future service credit, which is credit awarded for employment with a contributing employer after October 1, 1965. Id. §§ 2.1-2.2. Past service credits are calculated in terms of whole years with no allowance for partial credit, see September 19, 2011 Order at 6 (determining that 1971 Plan clearly "does not contemplate the use of partial years of credited

---

[8] The plaintiff also asserts that the 1993 Plan is made applicable to him through the merger agreement between the Union and the IPAT. Pl.'s Suppl. Mem. at 1-3. That agreement, which was made effective January 1, 1998, incorporates the Local 963 Plan "as amended and restated through October 1, 1965, and as thereafter amended and restated." Defs.' Mot., Ex. 42 (Merger Agreement) § 2.04. Yet, the fact that the merger agreement incorporates the terms of the 1993 Plan does not aid the plaintiff's position, because the 1993 Plan is made inapplicable to the plaintiff by its own terms. See 1993 Plan § 11.4.

service because it only speaks of awarding credits in one year increments"), whereas partial

credit is awarded for future service, 1971 Plan § 2.2 (granting "tenths of credit" for future service

based on certain ranges of hours worked in covered employment).  If, prior to completing 10

years of credited service (i.e., prior to vesting), an employee worked fewer than 160 hours for

two consecutive calendar years, that employee, absent two exceptions, loses all credited service.

1971 Plan § 2.3 (providing that "[a] loss of credited service will cause the cancellation of all

credited service accrued to date, both past and future," except under certain conditions involving

disability and military service, which are not applicable in this case).

      The plaintiff acknowledges a break in service from 1973 to 1978.  See Pl.'s Reply, Ex. 41

(Supplemental Affidavit of Ian James) at 1-2 (detailing all contributory service from 1959 to

1980, and listing no employment for 1973 through 1978); Deposition of Ian Philip James [ECF

No. 17-1] at 128:17-19 (acknowledging non-union employment with Beltway from 1973 through

1978); Pl.'s Suppl. Mem. at 5 (contending that the undisputed evidence demonstrates that the

plaintiff is entitled to 14.54 years of service credits for service in "1959 through 1972, and 1979

and 1980").  Thus, unless he vested prior to 1973, the plaintiff admittedly incurred a two-year

break in service that canceled all of his service credit.  See 1971 Plan § 2.3.

      In denying the plaintiff benefits, the defendants determined that he incurred a complete

loss of service credit because he did not accrue 10 years of service prior to 1973.  Defs.' Renew.

Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit

Appeal) at 4.  According to the defendants, the plaintiff is entitled to 3 years of past service

credit for work he performed from August 1962 to October 1965, Pl.'s Suppl. Mem., Ex. 53

(October 13, 2011 Letter from Kent Cprek to Neil Intrater) at 4-5, and 6.2 years of future service

credit for work he performed from October 1965 to April 1972, Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 4. With a total of only 9.2 service credits prior to 1973, it is the defendants' position that the plaintiff did not vest for the receipt of benefits before incurring his five-year break in service from 1973 to 1978, thus resulting in the termination of all service credit. Defs.' Suppl. Reply at 2. The plaintiff, on the other hand, contends that he is a vested employee because he is entitled to 14.54 years of service credit. Pl.'s Renew. Mot. at 11. Specifically, he claims that he worked from 1959 through 1972, and again in 1979 and 1980 in covered employment (i.e., employment covered by collective bargaining agreements with the Union). Id. at 3. The Court will consider the plaintiff's disputed service credit in chronological order.

**1.      Past Service Credit for Work Performed from 1959 through 1962**

The 1971 Plan awards employees one year of past service credit for each year prior to October 1, 1965, during which they were "employed under collectively bargained agreements of the Union." 1971 Plan § 2.1. Regarding the plaintiff's claimed work from 1959 through 1962, the parties' dispute concerns whether the plaintiff's work was covered by Union collective bargaining agreements.

The plaintiff claims that between 1959 and 1962 he worked for employers who had collective bargaining agreements with the Union. Pl.'s Reply, Ex. 41 (Supplemental Affidavit of Ian James) at 1. As support for his position, the plaintiff relies on his own affidavit and deposition testimony, as well as his SSA earnings report. Pl.'s Suppl. Mem. at 6-8. He also relies on a copy of his SSA earnings report that contains notations by one of the defendants' employees, purportedly identifying those employers who had collective bargaining agreements

21

with the Union.  See Pl.'s Renew. Mot., Ex. 44 (April 12, 2007 Fax from Tim Edney to Patricia

Convey re Ian James with Annotated SSA Earnings Report Attached) at 2-8; see also Defs.'

Renew. Opp'n at 8 n.3 (acknowledging that "the 'yes' notations [on the SSA earnings report]

were made by Tim Edney, a retired officer of the [IPAT] District Council 51," and explaining

that "[t]he Plan asked him to identify employers who had Local 963 Plan agreements.").

The defendants declined to credit the plaintiff for any work he performed prior to August

1, 1962.  Defs.' Renew. Opp'n at 4.  While acknowledging that the SSA earnings report "shows

work before 1962 with Local 963 employers," the defendants determined that this record sheds

no light on whether the plaintiff's pre-1962 work was covered "under a Local 963 [c]ollective

[b]argaining [a]greement" as required by the 1971 Plan.  Defs.' Mot., Ex. 4 (March 3, 2008

Letter from Gary Meyers to Neil Intrater) at 3.  The defendants added that the plaintiff's Union

membership records show that he was not initiated into the Union until August 1, 1962, and

reveal no payment of union dues by the plaintiff prior to this date; these records, in the

defendants' view, demonstrate that the plaintiff was not working under a Union collective

bargaining agreement until August 1, 1962.  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter

from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3; see Defs.' Mot., Ex. 10

(Official Membership Book of Brotherhood of Painters, Decorators, and Paperhangers) at 1

(listing the plaintiff's "Date of [Union] Initiation" as "8-1-62").  As for the plaintiffs' testimony

regarding his work under collective bargaining agreements from 1959 to 1962, the defendants

found that "[t]he belated and self-serving claim of the [plaintiff] about the nature of his work at

this point is insufficient to overcome the contemporaneous records."  Defs.' Mot., Ex. 4 (March

3, 2008 Letter from Gary Meyers to Neil Intrater) at 3.  The "contemporaneous records" to which

the defendants referred are the Union membership records, as well as the previously discussed 1973 Pension Record, which indicates that the plaintiff accumulated 3.3 years of past service credit, see supra at 3; Pl.'s Mot., Ex. 13 (1973 Pension Record).  The defendants determined that the 1973 Pension Record's attribution of 3.3 past service credits to the plaintiff is consistent with past service starting from the plaintiff's Union initiation date of August 1, 1962, and ending on October 31, 1965.  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3.  For these reasons, the defendants found it "unlikely that [the plaintiff's work from 1959 to 1962] was covered by the collective bargaining agreement."  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3.

The Court deems the defendants' determination reasonable.  They recognized that the plaintiff worked for employers with Union collective bargaining agreements from 1959 to 1962, but found no reliable evidence that the plaintiff's work during this period was covered by those agreements such that past service credit should be awarded.  The defendants further concluded that the Union membership records and 1973 Pension Record indicate that the plaintiff's work was not covered by the agreements, an inference the Court views as reasonable.  The only evidence supporting the plaintiff's claimed work history under collective bargaining agreements with the Union was the plaintiff's own testimony, which the defendants deemed "belated," "self-serving," and outweighed by "the contemporaneous records."  Defs.' Mot., Ex. 4 (March 3, 2008 Letter from Gary Meyers to Neil Intrater) at 3.  Because the standard of review here is deferential, the Court may not "substitute [its] own weighing of the evidence for that of the administrator."  Wilcox v. Liberty Life Assur. Co. of Boston, 552 F.3d 693, 702 (8th Cir. 2009)

(internal quotation marks and citation omitted).  And although "[a] plan administrator abuses its

discretion when it ignores relevant evidence," id. at 701, or, worse yet, when it "focuse[s] on

slivers of information that could be read to support a denial of [benefits] and ignore[s]—without

explanation—a wealth of evidence that directly contradict[] its basis for denying [benefits],"

Metro. Life Ins. Co. v. Conger, 474 F.3d 258, 265 (6th Cir. 2007) (emphasis in original), the

defendants did not engage in such conduct here.  They instead weighed all the evidence

presented to them and offered a rational explanation of why, in their view, the plaintiff had not

sufficiently proven that his work from 1959 to 1962 was performed under a collective bargaining

agreement with the Union.

The plaintiff asserts that from 1959 to 1961 he worked as a "journeyman . . . for union

employers and was covered under collective bargaining agreements with the [U]nion," and that,

during this time period, he "paid union dues," his "union employers paid union contributions for

him," and he "received periodic union membership cards."  Pl.'s Renew. Mot. at 15.  Although

seemingly acknowledging that while working as a journeyman he was not formally initiated into

the Union, the plaintiff contends that "even under an abuse of discretion standard, benefits

cannot be denied to an employee simply because he has not yet been initiated into the union."

Id. at 16.  He cites Kennedy v. Electricians Pension Plan, IBEW No. 996, 954 F.2d 1116 (5th

Cir. 1992), as support for his position.  In Kennedy, a plan administrator denied past service

credit to an employee for his work as an apprentice electrician because the work preceded his

union initiation date.  Id. at 1122-23.  The Fifth Circuit found that the plan administrator's

reading of the plan requiring this result was unreasonable:

> The relevant language from the Plan . . . does not support Appellants' position
> that the Plan requires initiation into the Union for entitlement to past service
> credits.  The language plainly states that employees who were active members of

the "Collective Bargaining Unit" in October 1970 will receive past service credit for every year of continuous and unbroken service in the collective bargaining unit.  As we read the Plan, Kennedy's continuous membership in the collective bargaining unit between October 1950 and October 1970, entitled him to Plan coverage.

There is simply no language in the Plan to support the Trustees' interpretation. Initiation into the Union is not specified as a prerequisite for such credit. Moreover, the language that requires submission of proof of other items (i.e., dependency and successive employment) further demonstrates that the past service credits are not hinged to initiation in the union.  It is undisputed that apprentices were members of the collective bargaining unit, and the facts show that Kennedy's membership in the collective bargaining unit (through his employment with participating employers) was continuous and unbroken. For these reasons, we conclude that a fair reading of Section 4.01(b) would entitle Kennedy to past service credits.

Id. (footnote omitted).

The plaintiff's reliance on Kennedy is unavailing for several reasons.  First, while it is true that the 1971 Plan, like the plan in Kennedy, does not make union initiation a prerequisite for past service credit, the 1971 Plan does limit past service credit to years during which an employee was "employed under collectively bargained agreements of the Union."  1971 Plan § 2.1.  The defendants here did not deny past service credit to the plaintiff solely based on the timing of his Union initiation.  Rather, they determined that the plaintiff failed to present reliable evidence that he worked under Union collective bargaining agreements prior to his documented Union initiation date of August 1, 1962, and, in the absence of such evidence, they deemed it unlikely that the plaintiff's work was covered prior to his Union initiation.  Second, whereas the plaintiff in Kennedy indisputably was an "active member of the 'Collective Bargaining Unit'" based on his status as an apprentice electrician, 954 F.2d at 1122-23 (noting that it was "undisputed that apprentices were members of the collective bargaining unit"), it is not so clear here that the plaintiff's status as a journeyman necessarily meant he was "employed under

collectively bargained agreements of the Union" within the meaning of Section 2.1 of the 1971

Plan.  Here again, the only support for the plaintiff's position is his own testimony, which the

defendants discredited due to other evidence they considered more convincing, a determination

which this Court is not at liberty to weigh.  See Wilcox, 552 F.3d at 702.

 For the foregoing reasons, the Court concludes that the defendants reasonably denied the

plaintiff past service credit for his claimed work from 1959 to 1962. [9]

### 2. Past Service Credit for Work Performed from 1962 through 1965

 Before addressing the defendants' calculation of the plaintiff's past service credits from

1962 through 1965, two initial matters of Plan interpretation must be addressed. [10]  The first issue

is whether the plaintiff should be granted either a full year of past service credit or no credit at all

for work he performed before October 1, 1965, that did not span a full year.  As previously

discussed, the defendants originally accorded the plaintiff 3.3 past service credits for work from

August 1, 1962, to October 31, 1965.  See Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from

Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3.  However, at the plaintiff's

urging, the Court determined that the defendants' attribution of 3.3 credits rested on an

unreasonable interpretation of the 1971 Plan, which plainly does not permit partial credit for past

---

[9] The Court notes that, even assuming the plaintiff's pre-1962 work was covered under Union collective bargaining agreements, the plaintiff's entitlement to past service credit for this time period would still be questionable because he has not shown that he worked full years under those agreements.  As explained infra at page 27 of this memorandum opinion, the defendants reasonably concluded that the 1971 Plan only awards past service credit for complete years of work (measured in terms of "fiscal year[s]" running from November 1 to October 31), and thus does not allow partial credit for past service.  Yet, the plaintiff's SSA earnings report shows that he intermittently moved from job to job between 1959 and 1962, casting doubt on whether he performed full years of work under Union collective bargaining agreements.  See Pl.'s Renew. Mot., Ex. 46 (SSA Itemized Statement of Earnings for Ian Philip James) at 1-3.  The defendants highlighted this fact in one of their denial of benefits determinations, but did not explain why the fact was relevant under the terms of the 1971 Plan.  See Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3 ("[t]he Trustees recognize that there is prior work with glass industry employers on the SSA earnings reports, but [the plaintiff] moved from job to job.").

[10] Unless otherwise indicated, all further references to the Plan refer to the 1971 version of the Plan.

service, and accordingly remanded the case to the defendants for a revised calculation of the

plaintiff's past service credits.  September 19, 2011 Order at 6-8.  On remand by this Court, the

defendants concluded that the plaintiff was entitled to only 3 years of past service credits.  Pl.'s

Suppl. Mem., Ex. 53 (October 13, 2011 Letter from Kent Cprek to Neil Intrater) at 4-5.

Although the plaintiff challenges this conclusion by contending that the 1971 Plan provides for a

full year of past service credit for any part of a year worked under a collective bargaining

agreement prior to October 1, 1965, Pl.'s Suppl. Reply at 5, the Court has already determined

that 1971 Plan provision concerning past service credit is ambiguous, and that, under one

reasonable reading of that provision, "an employee is required to work for a full year in order to

receive one year of past service credit."  September 19, 2011 Order at 5 (emphasis added).

Because the defendants have essentially adopted this reasonable interpretation of the 1971 Plan's

past service credit provision, the plaintiff's challenge to it must be rejected.

      The second issue of Plan interpretation concerns the calculation of service credit for work

performed in October 1965.  The 1971 Plan grants one year of past service credit for each "fiscal

year" before October 1, 1965, that an employee worked under a Union collective bargaining

agreement, 1971 § 2.1, and a "fiscal year" is defined as "the period from November 1, through

October 31," id. § 1.9 (emphasis added).  But the 1971 Plan also provides future service credit

for work performed after October 1, 1965.  Id. § 2.2.  This language suggests that certain

employees are entitled to both past and future service credit for work performed in October 1965.

For example, if an employee worked from November 1, 1964, to October 31, 1966, that

employee would be entitled to past service credit for November 1, 1964, to October 31, 1965,

and future service for October 1, 1965, to October 31, 1966, thus granting the employee double

credit for October 1965.  The defendants found that the 1971 Plan required such an award of double credit for the plaintiff's work in October 1965.  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3; see also Defs.' Renew. Mem. at 18 (stating that "[t]he Trustees found that work in October 1965 counts toward past and future service . . . This somewhat odd result is commanded by the 1971 Plan document." (emphasis in original)).  The plaintiff does not directly respond to this contention, but the Court agrees with the defendants that the 1971 Plan's terms compel the conclusion they reached.[11]

The Court's focus thus turns to the reasonableness of the defendants' past service credit calculation.  The defendants awarded 3 years of past service credit to the plaintiff for work starting on his August 1, 1962 Union initiation date and ending on October 31, 1965, the "fiscal year" end-date.  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3; Pl.'s Suppl. Mem., Ex. 53 (October 13, 2011 Letter from Kent Cprek to Neil Intrater) at 4-5.  The plaintiff was therefore credited for work starting in November 1, 1962, and ending on October 31, 1965.  This calculation is supported by the Union membership records, which show an August 1, 1962 initiation date, and the 1973 Pension Record, which lists the plaintiff as having 3.3 past service credits.  Consistent with the defendants' reasonable interpretation of the 1971 Plan's ambiguous past service credit provision, 0.3 credits were omitted from the 3.3 figure found in the 1973 Pension Record because partial credit is not granted for past service and employees had to work a full year to earn 1 past service

---

[11] The Court had previously expressed concern about the defendants inexplicably "dropping" past service credit for the plaintiff's work in 1965.  See James, 710 F. Supp. 2d at 27 n.4.  However, the defendants' subsequent explanations make clear that they did not omit any credit for 1965, and that work performed in October 1965 was actually counted twice.

credit.  Because an award of 3 years past service credit is supported by the record evidence and because the Court discerns no error in the defendants' resolution of the 1971 Plan's ambiguous provisions, the Court deems the defendants' past service credit calculation reasonable.

The plaintiff critiques the defendants' reliance on the 1973 Pension Record, asserting that the document is "patently incorrect" because it grants partial credit for past service, even though the 1971 Plan plainly does not permit partial past service credit.  Pl.'s Renew. Mot. at 9-10.  To be sure, the past service credit calculations in the 1973 Pension Record appear to reflect the defendants' prior, mistaken belief that the 1971 Plan allows partial years for past service, insofar as the record lists past service credits as decimal numbers rather than whole numbers.  See Pl.'s Mot., Ex. 13 (1973 Pension Record).  But that does not render the record utterly worthless.  On the contrary, the 1973 Pension Record is one of the few contemporaneous records available in this case, and while its past service credit figures may rest on an erroneous interpretation of the 1971 Plan, there is no indication that the data contained therein is factually inaccurate, or that the document is inauthentic.  Furthermore, the record's attribution of 3.3 years of past service credit to the plaintiff is corroborated by the record in this case, as it reflects service starting on the plaintiff's documented Union initiation date of August 1, 1962, and ending on October 31, 1965, the "fiscal year" end-date under the 1971 Plan.  See Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 3 (explaining that "[t]he time from August 1, 1962 . . . to October 31, 1965 . . .would be three (3 years) and three months, or 3 and 3/12 years.  This would be 3.25 years in decimal terms that would round up to 3.3 years for records kept in 1/10 years.").  The Court also views as reasonable the defendants' explanation of why they generally rely on such plan records in making benefits determinations.

See id. (stating that "[t]he Trustees' inclination is to rely on plan records, particularly if they are consistent with other records, as the best basis for uniform treatment of all employees. Absent some indication that the Local 963 Plan record is clearly erroneous, the Trustees are not inclined to try to re-create the distant past based on [the plaintiff's] claims alone."). Because the Court agrees that the 1973 Pension Record does not appear to be "clearly erroneous," id., it cannot fault the defendants for relying upon it.

> **3.      Future Service Credit for Work Performed from 1965 through 1972**

Having found that the defendants reasonably attributed 3 years of past service credit to the plaintiff, the Court next examines the defendants' award of future service credit. Relying on the 1973 Pension Record and the plaintiff's SSA earnings report, the defendants awarded the plaintiff 6.2 years of future service credit. Defs.' Mot., Ex. 4 (March 3, 2008 Letter from Gary Meyers to Neil Intrater) at 3; Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 4. This award covers work from October 1, 1965, to some unspecified date in April 1972. Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 4.

The plaintiff does not appear to raise any specific challenge to the defendants' future service credit award of 6.2 years. In their July 9, 2010 benefits determination letter, the defendants stated that they understood the plaintiff "not [to] contest the future service calculation of 6.2 years of (contributory) service, except to claim an additional 1.58 years of future service credit. This credit is partially in 1972, but more importantly in 1979 and 1980." Id. For 1972, the plaintiff sought a "full year of credit." Id.; see also Defs.' Mot., Ex. 35 (April 18, 2007 Fax from Neil Intrater to Gary Meyers) at 4 (claiming entitlement to "1.00" credit for work in 1972

with "F&M Shaeffer/Beltway Glass").  The defendants declined to grant such credit because the 1973 Pension Record "already show[s] 0.8 years of credit for 1972," and, in any event, "0.2 years credit would not create vested rights."  Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 4.  As previously stated, the Court does not view the defendants' reliance on the 1973 Pension Record as unreasonable, and it therefore finds no error in their determination that the plaintiff was entitled to 0.8 years of credit for 1972 rather than 1.0 credit.  The Court also agrees with the defendants' conclusion that, even if the plaintiff were granted an additional 0.2 service credits, he would still fall short of the 10 service credits required for vesting.

In sum, the defendants reasonably concluded that the plaintiff was entitled to 3 past service credits for years 1962 through 1965 and 6.2 future service credits for years 1965 through 1972, for a total of 9.2 service credits.  It follows that the plaintiff does not have a vested pension under the 1971 Plan since he did not accrue 10 years of service credit prior to his acknowledged break in service from 1973 to 1978.  Under the plain language of the 1971 Plan, the plaintiff lost all service credit, both past and future, upon this break in service.[12]  See 1971 Plan § 2.3. Summary judgment as to the plaintiff's wrongful denial of benefits claim will accordingly be granted in the defendants' favor.

### 4.    The Adequacy of the Defendants' Explanation for Denial of Benefits

The plaintiff asserts that the defendants have failed to provide him with an "understandable explanation for the denial of benefits" in violation of 29 U.S.C. § 1133.  3d Am. Compl. ¶ 39.  This section of the ERISA directs that "every employee benefit plan" must

---

[12] This ruling moots the need for any inquiry as to whether the defendants reasonably denied the plaintiff future service credits for 1979 and 1980.

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  The Department of Labor's regulations adopted to implement this statutory

directive requires plan administrators to provide written notification to a claimant of "any

adverse benefit determination" setting forth

in a manner calculated to be understood by the claimant . . . (i) [t]he specific reason or reasons for the adverse determination; (ii) [r]eference to the specific plan provisions on which the determination is based; (iii) [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary.

29 C.F.R. § 2560.503-1(g)(1).

The District of Columbia Circuit has established the following standards for evaluating

alleged violations of Section 1133:

Along with our sister circuits, we have adopted the "substantial compliance" test to determine whether denial notices comply with section 1133 and the regulation. See Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 493 (D.C. Cir. 1998). Technical noncompliance will be excused as long as the notice substantially complies with the statute and regulation. See id.  In assessing whether a notice substantially complies, we consider not just the notice itself, but all communications between the insurance company and the claimant.  See id. Courts make the substantial compliance determination on a case-by-case basis, assessing the information provided by the insurer in the context of the beneficiary's claim.  Heller is typical:

[A]lthough the initial letter from [the insurer] informing [the claimant] of the denial of her disability benefits did not conform to the requirements of the regulations, "the procedures, when viewed in light of the myriad communications between claimant, her counsel and the insurer, [appear] sufficient to meet the purposes of Section 1133 in insuring that the claimant understood the reasons

for the denial of [her benefits] as well as her right to review of the decision."

142 F.3d at 493 (quoting Kent v. United Omaha Life Ins. Co., 96 F.3d 803, 807 (6th Cir. 1996)).

White v. Aetna Life Ins. Co., 210 F.3d 412, 414 (D.C. Cir. 2000) (some internal citations omitted).  "[A]n administrator's compliance with § [1133] in making an adverse benefit determination is probative of whether the decision to deny benefits was arbitrary and capricious," Miller v. Am. Airlines, Inc., 632 F.3d 837, 851 (3d Cir. 2011) (collecting cases), or, in the parlance of this Circuit, "unreasonable," Block, 952 F.2d at 1455.[13]

In challenging the defendants' actions under Section 1133, the plaintiff maintains that the defendants have refused to explain how they calculated their prior award (which was later retracted) of $409.68 in monthly pension benefits, despite the plaintiff's repeated requests for such an explanation.  Pl.'s Renew. Mot. at 17-19.  He contends that the ERISA "does not permit the [d]efendants to claim that the previous pension award was a calculation error without ever explaining what the calculation error was."  Id. at 19.

The Court is not persuaded by the plaintiff's arguments.  While the Court accepts the plaintiff's implicit (but unarticulated) premise that the defendants' retraction of the $409.68 award was an "adverse benefit determination" to which the ERISA notice requirements apply, see 29 C.F.R. § 2560.503-1(g)(1), it finds that the defendants "substantially complied" with those notice requirements by explaining the reasons for their retraction.  After initially notifying the

---

[13] For the defendants' alleged violation of Section 1133, the plaintiff seeks statutory penalties under 29 U.S.C. § 1132(c)(1)(B).  See 3d Am. Compl. ¶¶ 40-42.  As the Court explains below, however, statutory penalties under Section 1132(c)(1)(B) are not available for violations of Section 1133.  See infra at 41-42.  Nevertheless, because a violation of Section 1133's notice requirements may be grounds to deem the defendants' denial of benefits determination unreasonable, the Court will proceed to analyze the plaintiff's arguments made pursuant to Section 1133.

plaintiff of the $409.68 award on June 27, 2007, the defendants sent the plaintiff a letter containing a "breakdown of the calculation regarding [the plaintiff's] benefit."  Defs.' Mot., Ex. 38 (August 16, 2007 Letter from Gary Meyers to Neil Intrater) at 1.  As previously noted, this breakdown showed that the defendants' calculation of the $409.68 award was arithmetically incorrect.  Id.; see supra at 7 n.4.  The defendants later confirmed that the award rested on a mathematical error in their June 19, 2008 letter retracting the $409.68 benefit award.  Pl.'s Mot., Ex. 8 (June 19, 2008 Letter from Gary Meyers to Ian James) at 1-2.  The plaintiff resists this explanation, insisting that there was some sort of undisclosed formula that the defendants used to reach the $409.68 figure, see Pl.'s Mot. at 9, but there is no indication that this calculation was anything other than an honest mistake.

In any event, the Court is satisfied that the defendants' various correspondence, when viewed in the aggregate, "substantially complied" with the ERISA's notice requirements.  See, e.g., Defs.' Mot., Ex. 4 (March 3, 2008 Letter from Gary Meyers to Neil Intrater); Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal); Pl.'s Suppl. Mem., Ex. 53 (October 13, 2011 Letter from Kent Cprek to Neil Intrater). Indeed, the plaintiff does not dispute that these letters contained "[t]he specific reason or reasons for the adverse determinations," and cited the "specific plan provisions on which the determination[s] [were] based."  29 C.F.R. § 2560.503-1(g)(1).  The defendants also adequately described what "additional material or information [was] necessary for the claimant to perfect the claim," id., by noting that the plaintiff had "not produced any reliable evidence of additional service beyond the [1973 Pension Record]," except for his own "belated and self-serving" testimony, Defs.' Mot., Ex. 4 (March 3, 2008 Letter from Gary Meyers to Neil Intrater) 2-3, and

by pointing out the absence of "evidence of any contributions to the Local 963 Plan for work by [the plaintiff] after October 1, 1976," Defs.' Renew. Mem., Ex. 45 (July 9, 2010 Letter from Gary J. Meyers to Neil Intrater Re: Ian James Benefit Appeal) at 2.  And the defendants advised the plaintiff of his right to challenge their decision in federal court pursuant to the ERISA.  See Defs.' Mot., Ex. 4 (March 3, 2008 Letter from Gary Meyers to Neil Intrater) 4 (stating that the plaintiff "has now exhausted his remedies under the Plan," and that a "claimant who disagrees with the Plan's decision or lack thereof may file suit in federal court[] under Section 502(a) of [the] ERISA, 29 U.S.C. § 1132(a), following an adverse benefit determination.").  As a consequence, even if the initial June 19, 2008 letter retracting the $409.68 benefit award was inadequate, the Court finds that the defendants' various correspondence, as a whole, discharged their notice obligations under the ERISA.  See Heller, 142 F.3d at 493 ("[A]lthough the initial letter from [the insurer] informing [the plaintiff] of the denial of her disability benefits did not conform to the requirements of the regulations, the procedures, when viewed in light of the myriad communications between claimant, her counsel and the insurer, [appear] sufficient to meet the purposes of Section 1133 in insuring that the claimant understood the reasons for the denial of [her benefits] as well as her right to review of the decision." (internal quotation marks and citation omitted; alterations in original)).  The Court thus finds the plaintiff's challenge under the ERISA's notice requirements unavailing.

## C.     The Plaintiff's Claim for Failure to Produce Plan Documents

Count 5 of the third amended complaint seeks damages under 29 U.S.C. § 1132(c)(1)(B), a provision of the ERISA that requires plan administrators to provide information requested by plan participants or beneficiaries within 30 days of such a request, or face a statutory penalty.

Specifically, the plaintiff asserts that defendant Gary Meyers, the plan administrator, failed to

furnish copies "of the relevant plans and regulations" and "the [p]laintiff's records," among other

things, despite the plaintiff's repeated written requests for these documents.  3d Am. Compl. ¶¶

40-42.

### 1.    Statutory Standing

As an initial matter, the Court must determine whether the plaintiff has statutory standing

to seek damages under 29 U.S.C. § 1132(c)(1)(B).  To have such standing, the plaintiff must be

either a "participant" or a "beneficiary" within the meaning of the ERISA.  See 29 U.S.C. §

1132(a)(1)(A); Chuck v. Hewlett Packard Co., 455 F.3d 1026, 1038 (9th Cir. 2006).  Because the

plaintiff does not claim to be a "beneficiary," the Court must assess whether he is a "participant,"

a term that the ERISA defines in pertinent part as "any . . . former employee . . . who is or may

become eligible to receive a benefit of any type from an employee benefit plan."  29 U.S.C. §

1002(7).  The Supreme Court has construed this definition of "participant" to include "former

employees . . . who have a colorable claim to vested benefits."  Firestone Tire & Rubber Co. v.

Bruch, 489 U.S. 101, 117-18 (1989) (internal quotation marks and citation omitted; emphasis

added).  For a former employee "to establish that he or she may become eligible for benefits,

[the] claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or

that (2) eligibility requirements will be fulfilled in the future."  Id.  The plaintiff does not contend

that eligibility requirements will be satisfied in the future, so the issue here is whether the

plaintiff had a colorable claim that he would prevail in a suit for benefits at the time he instituted

this lawsuit.  See Chuck, 455 F.3d at 1038-39 ("[T]he issue we face is whether [the plaintiff] had

a colorable claim that he would prevail in a suit for benefits.  Our examination concerns [the plaintiff's] status as of the time he filed his complaint.").

 "The requirements for a colorable claim are not stringent; a plaintiff need have only a nonfrivolous claim for the benefit in question." Kamler v. H/N Telecomm. Servs., Inc., 305 F.3d 672, 678 (7th Cir. 2002), cert. denied, 538 U.S. 946 (2003); accord Davis v. Featherstone, 97 F.3d 734, 737 (4th Cir. 1996); Abraham v. Exxon Corp., 85 F.3d 1126, 1129 (5th Cir. 1996).  And even though the Court has ruled that the plaintiff's wrongful denial of benefits claim fails on the merits, that does not defeat his standing as a "participant" to seek damages under Section 1132(c)(1)(B), for the plaintiff need only possess a "colorable" claim, not a successful one.  See Zirnhelt v. Mich. Consol. Gas Co., 526 F.3d 282, 290 (6th Cir. 2008) ("Even though [the plaintiff's] claim for benefits failed in the end, she still had a 'colorable' claim."); Neuma, Inc. v. AMP, Inc., 259 F.3d 864, 878 (7th Cir. 2001) ("Even in cases where a plaintiff's claim ultimately failed, the 'possibility' of success was sufficient to establish participant or beneficiary status.") (collecting cases); Davis, 97 F.3d at 737-38 ("A claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits."); Abraham 85 F.3d at 1129 ("[The plaintiff] may have ERISA standing even if he is ultimately not entitled to receive benefits under the plan.").

In the Court's view, the plaintiff presented a colorable claim to vested benefits at the time he filed this action.  The plaintiff maintained then, as he does now, that he worked in covered employment for over 14 years.  This work history, if credited, would have entitled him to a vested pension under the plain terms of either the 1971 or 1993 version of the Local 963 Plan.  Moreover, the defendants admitted that even they were unsure of the vesting rules applicable to

the plaintiff's claims until he instituted this lawsuit.  As they stated in one of their denial of benefits letters, "[t]he [plaintiff] appear[ed] to have the 10 years of vested service required by the 1993 Local 963 printout under" the "lower threshold" for service credit found in the 1993 Plan. Defs.' Mot., Ex. 4 (March 3, 2008 Letter from Gary Meyers to Neil Intrater) at 3.  "However," the defendants added, "the lawsuit has resulted in a deeper review of Local 963 plan documents by counsel that indicate different vesting rules for the [plaintiff] in 1973."  Id. at 4.  The defendants' uncertainty regarding the plaintiff's vested status is further evidenced by their initial award of $409.68 in monthly pension benefits, which they later retracted upon conducting their "deeper review" of the Local 963 Plan records after the plaintiff filed suit.  Pl.'s Mot., Ex. 8 (June 19, 2008 Letter from Gary Meyers to Ian James) at 1.  Given that the defendants themselves were unsure whether the plaintiff had vested benefits under the Local 963 Plan at the time this lawsuit was filed, the plaintiff's claim could hardly be characterized as frivolous.  See Zirnhelt, 526 F.3d at 290 (holding that former employee had colorable claim to vested benefits where she worked for employer for 12 years and "reasonably could have believed that those years of service satisfied the plan's ten-year [vesting] requirement," and where the employer "failed to define the precise vesting requirements applicable to [the plaintiff's] claims" in its various benefit-denial determinations).  Thus, because the plaintiff had a colorable claim to vested benefits when he filed his complaint, he has statutory standing as a "participant" to seek damages under Section 1132(c)(1)(B).

### 2.  The Merits of the Plaintiff's Claim for Failure to Produce Plan Documents

Having determined that the plaintiff has standing to seek damages under Section 1132(c)(1)(B), the Court now must consider whether he is entitled to those damages.  Under the

ERISA, plan administrators must, "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  29 U.S.C. § 1024(b)(4).  Plan administrators must also furnish, "upon written request" of a "participant or beneficiary," a "pension benefit statement" that lists "the total benefits accrued" as well as "the nonforfeitable pension benefits" already accrued or, if not accrued, "the earliest date on which benefits will become nonforfeitable."  Id. § 1025(a).  As the Seventh Circuit has recognized, the purpose of these disclosure requirements is to ensure that participants have "the information necessary to determine [their] eligibility for benefits under the plan, to understand [their] rights under the plan, to identify the persons to whom management of plan funds has been entrusted, and to ascertain the procedures [they] must follow in order to obtain benefits."  Mondry v. Am. Family Mut. Ins. Co., 557 F.3d 781, 793 (7th Cir. 2009) (internal citations omitted).  If the plan administrator fails to comply with a request for such information within 30 days, Section 1132(c)(1)(B) authorizes the imposition of statutory penalties.  Specifically, the statute provides in pertinent part that

> [a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

Id. § 1132(c)(1)(B).

The plaintiff submitted his initial document request to the defendants by letter dated December 12, 2006.  Pl.'s Mot., Ex. 16 (December 12, 2006 Letter from Neil Intrater to Gary Meyers) at 1-2.  This letter contained the following eleven requests:

1.  A clear and complete explanation as to exactly why Mr. James' claim has been denied with specific attention to years 1959 through 1972.

2.  A copy of Mr. James' complete union and fund records as they may relate to his pension in any way from 1959 through the present.

3.  A statement of exactly what months from 1959 through 1972 you claim Mr. James did not work under a bargaining agreement of the union.

4.  The full document containing the articles and sections you have cited and all related documents.

5.  A full, clear explanation of the relationship between the sections you have cited and Mr. James' factual situation including specific dates.

6.  A list of each year from 1959 through 1972 specifying the number of hours he worked each year under a bargaining agreement of the union and the number of credits he has for each year.

7.  A copy of the fund plan and any related rules and regulations which is applicable to Mr. James relative to his union employment from 1959 through 1972.

8.  Any 1966 Glaziers Local 963 Pension Fund documents in effect or applicable to years 1959 through 1972.

9.  A copy of the current Pension Fund and any related documents.

10. A copy of any merger agreement and any other documents related in any way to the merger of Glaziers Local 963 with the IUPAT and any documents which affect benefits therefrom.

11. A calculation, with an explanation of the formula used, of how much Mr. James would receive in monthly benefits assuming he worked under a bargaining agreement of the union from 1959 through 1972 and his wife was born on 6/18/55.

<u>Id.</u>  The plaintiff subsequently made seven more requests for these documents by correspondence dated March 26, April 5, April 18, July 5, July 12, July 17, and August 17 of 2007.  Pl.'s Mot., Exs. 17-23.  It is unclear when, if ever, the defendants provided the requested documents to the plaintiff.  The record does reveal that the defendants produced the "entire application file" to the plaintiff on August 16, 2007, Def.'s Mot., Ex. 38 (August 16, 2007 Letter from Gary Meyers to Neil Intrater) at 1, but there is no indication as to what information that file contained.

Although the plaintiff's various submissions fail to identify which of the requested documents are purportedly covered by the ERISA's disclosure requirements, the Court can initially dispose of two types of requested documents that plainly are not subject to production.  The first is the "union records" sought by the plaintiff.  <u>See</u> 3d Am. Compl. ¶¶ 40-42 (seeking statutory penalties under Section 1132(c)(1)(B) for defendant Meyer's alleged failure to provide "union employment records").  The Court does not discern how these records fall within any of the categories of Plan documents designated in Section 1024(b)(4), and the plaintiff offers no argument and cites no legal authority in support of his position that such documents must be produced.  Likewise, the "clear explanation" for the denial of the benefits sought by the plaintiff, while required by another provision of the ERISA, <u>see</u> 29 U.S.C. § 1133(1) (directing employee benefit plans to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant"), is not a Plan document subject to mandatory disclosure under Section 1024(b)(4).  Nor can the plaintiff recover statutory penalties under Section 1132(c)(1)(B) for the defendants' alleged failure to provide such an explanation.  <u>See</u> <u>Medina v. Metro. Life Ins. Co.</u>, 588 F.3d 41, 48 (1st Cir. 2009) ("It is well

established that a violation of § 1133 and its implementing regulations does not trigger monetary sanctions under § 1132(c)") (collecting cases).

On the other hand, two of the requested documents do appear to be subject to mandatory disclosure under Section 1024(b).  First, the "copy of the current Pension Fund" (the plaintiff's ninth request in the above list) is expressly covered by Section 1024(b)(4).  See 29 U.S.C. § 1024(b)(4) (requiring production, upon request, of the "plan description" and "other instruments under which the plan is established or operated"); see also Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 84 (1995) (interpreting identical language in Section 1024(b)(2) and noting that the "ERISA requires that every plan administrator make available . . . all currently operative, governing plan documents" (emphasis added)).  Second, the "full document containing the articles and sections you have cited" (the plaintiff's fourth request in the above list) also falls within the scope of the ERISA's disclosure requirements.[14]  By way of background as to this request, the defendants sent the plaintiff two letters in 2005 that quoted language from unidentified versions of the Local 963 Plan as the basis for denying him benefits without explaining the source of the quotation or attaching a copy of the quoted document.  See Def.'s Mot., Ex. 18 (March 29, 2005 Letter from Gary Meyers to Ian James) at 1; id., Ex. 25 (August 23, 2005 Letter from Gary Meyers to Ian James) at 1.  Accordingly, this document was an "instrument[] under which the plan" was "operated" by the defendants when they denied the plaintiff benefits, and was therefore subject to mandatory disclosure within 30 days upon written request by the plaintiff.  See 29 U.S.C. § 1024(b)(4).  This is true even though the defendants

---

[14] While neither the plaintiff's fourth or ninth document requests contain the word "plan," context indicates that these requests refer to the formal plan document.  The defendants do not dispute this point.  In fact, these particular document requests are not even discussed in the defendants' opposition brief.  See Defs.' Mem. at 10-14.

ultimately determined that a different version of the Local 963 Plan governs the plaintiff's

claims.  See Mondry, 557 F.3d at 800 (holding that "[w]hen a claims administrator mistakenly

relies on an expired version of the plan document, a set of internal guidelines, or any other

extraneous document in lieu of the governing plan language and, indeed, cites the language of

that document as controlling to the participant, then the participant must have access to that

document in order to understand what the claims administrator is doing and to effectively assert

his rights under the plan.").  The defendants do not dispute that they failed to comply with these

two particular requests within 30 days of receiving the plaintiff's letter dated December 12,

2006, see Def.'s Mem. at 10-14, and the plaintiff's numerous correspondence requesting

production of these documents, which continued well into August 2007, corroborate the

defendants' noncompliance.[15]

 The Court therefore finds that defendant Meyers violated the ERISA's document

disclosure requirements.  This does not mean, however, that statutory penalties are a foregone

conclusion.  Rather, "[t]he imposition of penalties for violating [Section 1132(c)(1)(B)] is left to

the discretion of the district court."  McDonald v. Pension Plan of NYSA–ILA Pension Tr. Fund,

320 F.3d 151, 163 (2d. Cir. 2003); see 29 U.S.C. § 1132(c)(1)(B).  Appropriate factors to be

considered before imposing penalties include "'bad faith or intentional conduct on the part of the

administrator, the length of the delay, the number of requests made and documents withheld, and

the existence of any prejudice to the participant or beneficiary.'"  Romero v. SmithKline

---

[15] The Court notes that the two requested Plan documents that the defendants apparently failed to provide to the plaintiff—the "current Pension Fund [Plan]" and the "full [Plan]" document containing the articles and sections you have cited"—may actually be the same document.  As explained above, the defendants' letters quoted language from an unidentified version of the Plan, so it may be the case that the Plan document "cited" was, in fact, the "current Pension Fund [Plan]."

Beecham, 309 F.3d 113, 120 (3d Cir. 2002) (quoting Devlin v. Empire Blue Cross & Blue

Shield, 274 F.3d 76, 90 (2d Cir. 2001)).

Upon review of the current record, the Court finds that it is insufficient to evaluate these

factors and determine whether any penalties should be imposed.  Specifically, based on the

parties' current submissions, the Court is unable to assess the degree of prejudice sustained by

the plaintiff, if any, resulting from the defendants' failure to timely produce the requested Plan

documents, or whether there was any intentional conduct or bad faith on defendant Meyer's part.

Moreover, because the current record does not reveal when, if ever, the defendants produced the

requested documents to the plaintiff, the Court is unable to determine the length of the

defendants' delay in producing the documents.  And, the length of the delay is relevant both to

the Court's decision of whether to impose penalties in the first instance, see Romero, 309 F.3d at

120, as well as the calculation of any penalties imposed, see 29 U.S.C. § 1024(b)(4) (providing

that plan administrators who violate the ERISA's disclosure requirements will be "personally

liable to such participant or beneficiary in the amount of up to $100 a day from the date of such

failure or refusal" (emphasis added)).  Accordingly, both parties' summary judgment motions

will be denied without prejudice as to the plaintiff's claim for failure to produce Plan documents,

and the parties are directed to submit supplemental briefing addressing those issues—and only

those issues—identified above by the Court.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the defendants' renewed motion for

summary judgment must be granted in part and denied in part, and that the plaintiff's renewed

motion for summary judgment must be denied.  Specifically, the defendants are granted

summary judgment as to (1) their determination that the 1971 Plan governs this case, and (2) the plaintiff's wrongful denial of benefits claim.  Both parties' motions are denied without prejudice as to the plaintiff's claim for failure to produce Plan documents, which, the Court notes, is now the only remaining claim in this case as a result of the foregoing rulings.

**SO ORDERED** this 24th day of February, 2012.[16]

REGGIE B. WALTON
United States District Judge

---

[16] The Court will contemporaneously issue an order consistent with this memorandum opinion.